Caroline K. Simon, J.
Claimant in this action sues for the wrongful death of his decedent son, Edward B. Anderson, and for the pain and suffering sustained by the six-year-old boy immediately prior to his death as a result of the alleged negligence of the State’s employees in the care, maintenance and supervision of the infant while a student and patient in Willowbrook State Hospital in Bichmond County, New York.
The claimant seeks a total of $500,000 together with costs and disbursements of the action, allocating $200,000 to the wrongful death phase, and $300,000 to the pain and suffering. Letters of *1062 administration were issued to the father by Surrogate Hildreth in Suffolk County on January 14, 1963, which letters warrant the filing of this claim in the father’s name. The claim was timely filed with the Clerk of the Court of Claims and the office of the Attorney-G-eneral of New York State on August 21, 1963, notice of intention to file having been given on February 21, 1963. The claim has neither been assigned nor submitted to any other court or tribunal for hearing or determination.
Claimant alleges that during the period between the placement of Edward in Willowbrook on April 12, 1962 and his departure from Willowbrook on April 25, 1962, a period of 13 days, the State, due to its carelessness and negligence, caused the death of Edward which occurred shortly after he arrived at home. The State maintains that Edward’s physical condition was volatile and fluctuating, and. that sudden and sharp changes are likely in encephalitic children, and that his death resulted from his mother’s insistence, over the State doctor’s objection, upon removing him from Willowbrook and taking him on the long four-hour trip home to Selden, in Suffolk County, despite his then high temperature and the unseasonably hot weather, and also from her feeding him soda and ice cream en route, and from her failure to call for medical assistance when she noticed his breathing was becoming abnormal.
According to medical testimony, Edward Anderson had suffered from cerebral palsy since the date of his birth, January 11, 1956. His parents testified that he was their fifth child, and that he was of a sunny, affectionate disposition, though unable to talk, and that during the 18 months prior to his admission to Willowbrook, he had shown definite improvement. They stated that his walking, which had been that of a spastic child requiring arm balance and support, had improved so that he could walk alone, could turn, and could jump. His mother stated that he had become able to pick up some food by himself, though he still required feeding help. He had not been toilet-trained, and continued to wear diapers, and to take liquids from a bottle.
The child’s pediatrician, who had cared for Edward for 14 months prior to his entering the school, testified that he considered the child obviously retarded, with no verbalization, little vocalizing, and as having advanced little since infancy. He was reported to have had his first convulsion, accompanied by fever and virus infection, at the age of 17 months, and also to have been treated for ear infections and respiratory ills. At periodic examinations, the doctor noted slow progress. By his third year, Edward began to walk spastically, which meant falling at any change of position if unsupported. At this fourth year, *1063 Edward’s walk had improved so that he could change position and jump without falling. He became more responsive and would show a big grin when demonstrating his walk, or a violent head shake if displeased. At the chronological age of six, when his mental age was about one and one-half years, he attended two out-patient clinics for mentally retarded children, and was taking prescribed medication but he continued to have convulsions during that year. The doctor felt that there was improvement evidenced by the fact that when Edward had a febrile illness for the first time no convulsion accompanied the fever.
The parents testified that they had made application for Edward’s admission to Willowbrook at the suggestion of a former Willowbrook nurse, who was then employed by a Cerebral Palsy Clinic which Edward attended. She advised them that the child would there be aided toward more independent functioning, and would receive proper hospital care. This recommendation was approved by their pediatrician, and after a waiting period of about three weeks, the child was accepted. The parents were given a list of clothing and other personal effects to be brought with the child. A booklet was also given to them as parents of a new enrollee, informing them of visiting hours, school facilities, routes by which to reach the facility, and other similar information.
Medical care and nursing service are stated to be available in the hospital building. The school building has its own director and teachers for those students not severely retarded and with sufficient I.Q. to be capable of class work. There is a doctor in charge of each of the separated buildings. Each home building doctor is responsible for the mental and physical health of the children in his building.
In the hospital there is a special pediatrics division for babies. An attending consulting pediatrician is available for those over five years old. Consulting physicians in other specialties are also on call.
On admission, the hospital recorded that it considered Edward a “sick child” and spastic. The clinical diagnosis was “Encephalitic (brain damage)/other, due to unknown causes, and major motor seizures.” The admission record, part of the hospital record introduced in evidence by claimant, showed that Edward, on April 12, 1962, the date of his arrival there, was a fairly well-nourished boy weighing 47% pounds. He was assigned to Building No. 19 on April 12 and was transferred on the same day to Ward A of Building No. 6.
All the children in Ward A were severely retarded boys ranging in age from six to eight years. Attendants assigned to *1064 the ward worked in three shifts of two attendants each. In addition there was a staff attendant and a doctor in charge and the hospital to which the doctor could send a sick child. The census for Ward A was variously ,set at 45 to 50 to 55 patients. The State doctor testified that Edward’s diagnosis of mental retardation was not unusual at the school, and that there were several such patients in Ward A with Edward in April of 1962. The entire building contained approximately 200 children. The total employment roll at Willowbrook in 1962 was stated to be about 2,000 and the number of patients approximately 6,000.
Edward’s hospital record reported a weight loss of three and one-half pounds on April 20, but no intravenous feedings were ordered or given to him because the Willowbrook doctor in charge of Edward considered that, despite his weight loss, such intravenous feedings were not necessary, according to testimony. No pediatrician was called to examine Edward by the doctor of Building No. 19 who testified that none was necessary. The hospital staff testified it was not their practice to record ward notes <£ Unless a child is sick or there are significant changes in its condition ”. Edward’s record indicated that medication was prescribed when he had an upper respiratory infection and a temperature of 101 degrees.
The hospital recorded that Edward sustained a laceration of his chin on April 23, 1962. It was not repaired at once, and claimant’s doctor considered the delay in treatment not good medical practice. He asserted that such delay means a wound takes longer to heal, and there is a greater risk of infection, and more pain results. On cross-examination he testified a cut can become infected even after care and can become enlarged if picked or scratched. The record shows that the chin laceration was cleaned with disinfectant drugs, neomycin ointment and a sterile dressing applied. Procaine penicillin also was ordered.
Testimony was adduced that Edward’s mother telephoned three times after his admission to ascertain how he was progressing and each time she testified that she was assured that he was fine. She further states that she had been informed that it was better not to visit the school during the initial adjustment period since a child would “ naturally ” be homesick, and would adjust better to the school regime if parents stayed away for the first few weeks. Visiting was permitted one day each week, either on Wednesday or Sunday. The mother’s first visit was made on April 25, 1962, a Wednesday. She was accompanied by an older daughter and another son. They went to the desk *1065 in Building No. 19 and asked for Edward and they were told, at 1:00 p.m., to take seats, and they did so. At 2:00 p.m. the side door opened and Mrs. Anderson testified that her son was brought out, supported on each side as he walked, by female attendants. She testified further that she could not believe it was her son and said “ That isn’t Eddie ”, but was assured it was, though there was no sign of recognition and no expression on his face.
She testified that she became excited, as did the attendants. She sat there holding Edward, determined to take him home, and told the nurse and doctor of this determination. She admits that they urged her to let him remain in the hospital but she was adamant, and they thereupon brought papers for her to sign. Prior to releasing Edward to her, she testified that the doctor examined Edward in her presence, and the hospital records list his written findings which include “ chest clear to p. and a.” (percussion and auscultation). The release the mother testified to signing includes a typed statement (part of the hospital record, claimant’s Exhibit No. 8) above her signature which reads 111 am taking my son home against the advice of the building physician and at my own risk. I promise to have my own doctor take care of Edward’s chin ”.
Edward’s mother stated that she telephoned her daughter-in-law, asking her to inform their pediatrician that she was bringing Edward “ who looked bad ” home, and to be on call when they arrived. Edward stayed with her until the release was given to her for her signature. She signed it at 4:00 p.m., also signing a receipt for his clothes, which had been brought by her as directed when he had been originally admitted. Later examination at home proved to her, she said, that none of the clothing had been worn except for a still-soiled diaper which she had put on him and which had been placed in the package at the hospital.
Before leaving the hospital, Mrs. Anderson realized that the ride home would be lengthy, and said that Edward should have a drink. Attendants brought half a glass of milk which he drank “ so fast as if inhaling”, though his face remained expressionless, she testified. Edward was then carried to their car, a four-door 1950 Pontiac sedan, and her daughter held him on her lap while Mrs. Anderson drove the car.
In the hour during which they waited for the ferry, Mrs. Anderson gave her son some cold soda and ice-cream pop. She noticed that Edward’s breathing was “funny — he didn’t move — his face was quiet and white ”. The trip home took four hours. "When they reached there, Edward was laid on a bed *1066 and claimant’s pediatrician, Dr. John O’Donnell, was telephoned. While the family watched Edward, they noticed that his breathing stopped in about 15 minutes, and before the arrival of the doctor. When the doctor arrived at 8:45 p.m. he pronounced Edward dead. The funeral expenses amounted to $700 and were stipulated as reasonable. The mother testified that no monument was built since they could afford none, but if one were built it would cost $200.
Claimant’s physician testified that the body was hot, indicating fever, dehydrated, emaciated, and had an inflammation of the lungs due to sucking in foreign material, and a break in the continuity of the esophagus where it reaches the stomach. Though claimant’s doctor in his direct testimony said vomiting and diarrhea could produce rupture of esophagus, on cross-examination he said there was no note in his record that Edward had been vomiting or diarrhetie nor did he recall being advised if Edward had been doing so on his way home. Claimant’s doctor said that the dehydration which he found to be acute must have been apparent the morning of Edward’s tragic death but on cross-examination testified that dehydration of itself could not cause death, nor could aspiration pneumonia alone.
Edward’s weight was recorded in the autopsy as 41% pounds. Claimant’s doctor testified that a severe weight loss is anything over 10% and that the effect of such a loss is more adverse the more acutely it happens. Claimant’s doctor further stated that no esophagus rupture existed before malnutrition, and that the intake of a cup of soda and part of a portion of ice cream en route could not rupture the esophagus, even of a child.
The claimant alleges that Edward suffered “ externe pain from a bursting esophagus caused by prolonged vomiting and lack of nutrition which was subsequent to twelve days of starvation and elimination pains” and from “a lacerated chin which was infected and unhealed”. Claimant’s doctor conceded that the ruptured esophagus could have resulted from the terminal period of aspiration pneumonia and that; this type of pneumonia could suddenly strike even a normal child.
The Police Department supplementary death report includes a statement by the Medical Examiner that the cause of death was ‘ ‘ dehydration, malnutrition and pneumonia ’ ’. The autopsy made at Mather Memorial Hospital on April 25, 1962 stated the cause of death to be “ aspiration pneumonia, diarrhea (historical) (a) dehydration and cachexia, Mallory-Weiss syndrome and.mental retardation (historical) (a) old infarction of brain ” and showed that the scalp “ sections of the hemorrhagic areas *1067 reveal a layer of well-organized hemorrhage (2-3 weeks at least) with some evidence of recent hemorrhage.” The period of “ 2-3 weeks ” would refer to a point of time before Edward’s admission to Willowbrook.
Claimant’s doctor testified that a ruptured esophagus caused Edward’s death, and that such a rupture would be exceedingly painful. He further stated that if daily nutrition in proper amounts is not supplied, starvation, dehydration, acidosis and death are certain to result, and that body resistance to infection is lessened by lack of protein.
Claimant’s doctor further stated his belief, based upon his experience, that if Edward had lived, he would eventually have been able to feed and dress himself and control bodily elimination, and in the ultimate future, after he had become 16 years old, he would have been able to work at such simple tasks as folding newspapers, affixing stamps, sealing envelopes for letter-service companies, dishwashing, placing boxes on designated shelves, etc., but would not be able to operate machinery. Claimant asserted through another witness that Edward could earn $1.25 per hour at the age of 16 and estimated that Edward’s total earnings to majority would have approximated $12,500.
The doctor in charge of Building No. 6, to which Edward had been assigned after his initial period in Building No. 19 ended, testified to knowing him well and to seeing him several times a day. He considered Edward severely retarded, not able to attend school, unable to feed himself, and suffering from brain damage. He testified to it being unusual for a boy of the chronological age of six still to be taking fluids from a bottle as Edward did, and thought this might have been a fault of Edward’s parents. He asserted that attendants were helping to develop Edward’s ability to feed himself. Edward was not toilet-trained when he entered the school.
The parents paid $5.50 a day toward Edward’s maintenance at the school. They assert he was a healthy, well-nourished child when he entered the school, with the prognosis of a normal and full life span. Expert testimony and the hospital record are to the contrary. The hospital record at admission shows a child with spastic gait and a weight on admission to the ward of 47% pounds and a height of 45%". His temperature was 101 degrees. His classification was imbecile with an intelligence quotient estimated to be 23, and his deterioration was noted to be “ severe ”. In the application for admission signed by his mother on March 20, 1962, he was stated to be “ hyperactive, restless, slow development ” and it included a note that “ parents cannot control child at home ”,
*1068 The summary at admission further stated Edward was a “ six year old well-developed well-nourished white male ”, with spasticity revealed in all extremities, “ spastic gait, history of epilepsy, grand mal seizures, not toilet-trained, not able to speak, falls easily, has to be fed The April 12, 1962 mental note of Dr. Gr. Piekman, supervising psychiatrist, states that he was “ fairly well developed”. On April 16 his appetite was noted as “ good ”. On April 17,1962, rectal swabs had revealed occasional pus cells and thereafter on April 18 and 19 laboratory tests were made to check this condition. On April 20 a loss of three pounds was noted “because of his poor adjustment and homesickness ”. Edward “was placed on a high caloric diet and Vitamin B Complex was prescribed ”. On April 23 a laceration of the chin was stated to have resulted from a fall out of bed at 11:00 p.m. The hospital record notes it was cleaned and dressed and that Edward was seen the next day by another doctor who ordered the 1%-inch wound again to be cleaned and then a neomycin dressing was applied.
On April 25 the record reports that Dr. Piekman examined Edward at 8:45 p.m., and because. of the infected laceration ordered penicillin for two days and also ordered “ Vitamin B12 weekly, high caloric diet with meritan C.B.C. and urine analysis and weight to be checked weekly ’ \ Edward, at that record point, had lost 6 pounds since his admission to the school 13 days before. The usual practice of weighing a patient every 2 weeks had not been followed in Edward’s case, his weight being recorded upon admission, then 9 days later, and again 4 days later, and defense maintains that the medical staff was aware of Edward’s weight loss and had taken steps to offset it — though the weight loss was stated to be not unusual immediately after admission of a patient to a new situation. Edward’s record also reports dental care on April 17.
Thereafter, a further entry on April 25, 1962 reports Edward’s discharge stating: “While mother was visiting her son today, she became upset because of the. sustained injury to the chin, and loss of weight, and requested his discharge at once. It was explained to her that the loss of weight is frequent with new admissions. According to mother’s own statement, the patient was very attached to her and apparently he was homesick, he ate poorly for the last few days and no doubt this was the cause of loss of weight. She was advised to leave the child here for a couple of weeks to help improve his condition but the mother refused, and, therefore, her request for his immediate discharge is granted. The mother is taking the child home against the advice of the undersigned, and at her *1069 own risk. He was examined before leaving and found in fail-physical condition: skin, scalp and gums clean with the exception of the lacerated chin, which the mother promised to have taken care of by her own physician ” and adding his condition was “ unimproved
Claimant alleges that the defendant concealed from Edward’s parents and affirmatively misrepresented the boy’s actual condition, and that the parents were thereby prevented from obtaining proper and timely medical care for the child in order to save his life.
Claimant’s doctor, though not an expert in hospital administration, testified, on the basis of his experience as attending pediatrician at hospitals, that one attendant for every four patients was necessary for children in Edward’s state of retardation. The doctor further testified that good medical practice required that if a hospitalized retarded child posed feeding problems, his parents be called in to use their special techniques. He also stated that good medical practice called for intravenous feeding of Edward when his regular intake 11 was not enough to sustain life ”.
Though the number of personnel in Edward’s ward was small, there is evidence that he was given feeding help. The court finds that informing the mother of the feeding problem noted in his record before it became an acute matter might have resulted in the mother coming to give such aid as she could to assist toward proper nutritional intake and that there was an error in judgment in not waiving the usual rule as to the interval of time between a child’s entry into the school and a parent’s first visit under these special circumstances. Since the court finds the unfortunate ride to be the precipitating factor in Edward’s death, the poor judgment used in failing to share with the parent the information as to feeding difficulties cannot be the basis of damages from the State, particularly since, in placing the child in the school, the mother stated he was difficult to handle and there is no certainty she could have helped feed him at school, though she had been able to do so at home prior to his school placement.
Regretfully, there is a basis for recognizing that the care given did not measure up to the ideal for Edward. No facts placed before the court warrant a finding that the esophagus was ruptured before Edward left Willowbrook, and the court must find that this dreadful event occurred either en route or at home, and therefore is not the State’s responsibility. The intervening factor of the withdrawal of the child by the parent against the doctor’s request for the specific reasons stated by *1070 Mm, wMch reasons are persuasive, prevents a judgment that the institution’s negligence caused the- death and necessitates a dismissal of this claim. The test by which the State’s liability must be ascertained is not to compare either the action or the result with the ideal situation of having no hurt come to a State patient, but rather to measure it against the legal standard of reasonable care. On this record, the court must and does find that legal requirement has been met.
The establishment and functioning of the Court of Claims is evidence that New York State intends to make real its aim that in this State government operates in the best interests of all its people, and that an appropriate remedy exists when that intent is not followed. The court has been termed the conscience of the State. (See “ The Court of Claims: Its Development and Present Eole in the Unified Court system ”, McNamara, 40 St. John’s L. Eev. 1, 49.) The standards set by laws and decisions appropriately and properly require special care by the State of its children. The mentally retarded child especially appeals to the hearts of all of us. Such an appeal cannot, however, be a substitute for the legal foundation of a court’s decision, which must be based solely upon the facts and the law.
In the instant matter, the hurtful death of a mentally retarded child is the basis for a claim against the State for money damages. There is evidence that taking a child, whose physical condition made likely sudden variations in health, from the State institution against the State doctor’s request, on an unseasonably hot day, when he was running a high temperature, for a four-hour trip, was the precipitating factor in his death.
The fact that there has been considerable public discussion of the school in which Edward Anderson was placed by his parents cannot influence the court’s determination. The court is not an investigating agency of State institutions, except insofar as a claimant is affected thereby. This decision must be based solely upon the evidence adduced in the instant claim.
Claimant has cited section 3-111 of the General Obligations Law, re-enacting section 73 of the Domestic Delations Law as prohibiting the imputation of the negligence of a parent or custodian to prevent recovery in an action brought by an infant to recover damages for personal injury. Giving the section the full weight it demands would relate only to the death of Edward and would not affect the action insofar as it relates to alleged wrongdoing by the State’s agents during Edward’s stay at Willowbrook. The courts have held that: “ The fact that negligence of a parent cannot be imputed to the child by *1071 virtue of section 73 of the Domestic Relations Law does not result in transferring a parent’s negligence to a landlord, nor can it result in increasing the landlord’s primary legal duty.” (Bullis v. Schuyler Hgts., 276 App. Div. 630, 632.)
In the same logic must be included the position that the State’s primary duty cannot be increased by negligence of the parents nor can the parents’ negligence be transferred to the State. Therefore, if, as the defense maintains, Edward’s death were solely due to his mother taking him, a mentally retarded child running a high temperature on an unseasonably hot day, on a long, fatiguing trip, and improperly feeding him during the journey, and not responding with medical care to his obvious breathing difficulty, then the impact of section 3-111 of the General Obligations Law cannot shift responsibility to the State, harsh though the result may seem.
Motherhood’s demands are real, as claimant’s able counsel stated. Devotion and care of children is a necessary fundamental and firm part of these demands. Equally a part of them is the need to seek and benefit from professional advice in the meeting of these demands. The heavy breathing noticed en route had not been mentioned during the two-hour waiting period in the hospital, and no reference to it was made in the mother’s testimony when she described holding Edward on her lap in the hospital. If, immediately upon noticing this abnormal condition, medical care were sought, and medical attention given, perhaps a different situation might have resulted.
The court is bound by the ruling in St. George v. State of New York (283 App. Div. 245-248 [1954], affd. 308 N. Y. 681) wherein it is stated: 1 ‘ Thus the issue is narrowed to this: Are the doctors, or is the State which employs them, legally responsible * * * for an honest error of professional judgment made by qualified and competent persons? We think this question must be answered in the negative. It has been so held in malpractice cases of all types for years ”.
The court notes that lacerations, such as Edward’s chin laceration, though something to be avoided, and a concern to parents and those in charge of children, are not uncommon and that few adults reach maturity without cutting or bruising themselves many times during childhood. Even in the most carefully supervised families, infection sometimes follows a cut. Therefore, to hold the State negligent in the instant matter would be unreasonable. The court finds that appropriate medical attention was given to Edward, and the State, though required to furnish such reasonable care and attention to its patients as their condition may warrant, is not an insurer. ‘ ‘ The State *1072 * * * is responsible, in the operation of its * * * institutions, only for hazards reasonably to be foreseen, only for risks reasonably to be perceived.” (Excelsior Ins. Co. v. State of New York, 296 N. Y. 40 [1946]; Flaherty v. State of New York, 296 N. Y. 342 [1947].)
It is axiomatic that the State has a duty to take every reasonable precaution to protect patients in its institutions from injury. Furthermore, the degree of care which the law exacts from those in charge of an institution for the mentally ill toward its patients is “ such reasonable care and attention for their safety * * * as their mental and physical condition, if known, may require, and should be in proportion to the physical and mental ailments of such patients”. (See 27 N. Y. Jur., Hospitals and Asylums, § 86.) Particularly is this obligation an imperative when the patient is a mentally retarded child. The State, when it exercises a quasi-parental power, is bound to use more diligence in determining the appropriate treatment for a patient than a parent would be bound to use. (See Pollock, Law of Torts [new Amer. ed., 1894], pp. 150-151.)
It is equally well recognized that the State is not an insurer of the safety of inmates of an institution for mental defectives. (See, also, Excelsior Ins. Co. v. State of New York and Flaherty v. State of New York, supra.)
The question to be determined is whether the State, knowing Edward’s physical and mental ills and his handicaps, exercised reasonable care to protect him. The court finds that it did. The court further finds that the medical decisions made by the doctors at Willowbrook were an exercise of their professional discretion which under the law the court must accept.
The court, though saddened by the death of the child, must, on the record before it, find that the claimant has not, by a fair preponderance of the evidence, established that the State failed to provide reasonably adequate care for the decedent or that the State was negligent.
The claimant’s skillfully presented arguments as to loss of potential earnings, Edward’s possible inheritance from, his father, and other damages cannot be given weight, since the court finds the precipitating cause of death was not the State’s responsibility.
Decision was reserved on the motion made at the end of claimant’s case to dismiss for failure to prove a prima facie case. That motion now is denied.
The motion made by the State at the close of the entire case to dismiss for failure to prove negligence, on which motion decision was reserved, is now granted. The claim is dismissed.